**RECORD CLUB OF AMERICA, INCORPORATED, Plaintiff–Appellee, Cross–Appellant,**

v.

**UNITED ARTISTS RECORDS, INCORPORATED, Defendant–Appellant, Cross–Appellee.**

Nos. 1149, 1291, Dockets 89–7039, 89–7041.

United States Court of Appeals, Second Circuit.

Argued June 7, 1989.

Decided Nov. 20, 1989.

Harold F. McGuire, New York City (McGuire & Tiernan, and Nancy G. Grossman, New York City, on the brief), for plaintiff-appellee, cross-appellant.

Daniel R. Murdock, New York City (John D. Worland, Jr., Richard J. DeMarco, Jr., Gregory J. Kilkenny, Donovan Leisure Newton & Irvine, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, on the brief), for defendant-appellant, cross-appellee.

Before FEINBERG and KEARSE, Circuit Judges, and BARTELS, Senior District Judge.*

KEARSE, Circuit Judge:

Defendant United Artists Records, Inc. ("United" or "UAR"), appeals from a judgment entered in the United States District Court for the Southern District of New York pursuant to Fed.R.Civ.P. 54(b), after bench trials on liability and damages before William C. Conner, *Judge*, awarding plaintiff Record Club of America, Inc. ("Record Club"), $3,518,865.36, including interest and net of certain setoffs, for losses resulting from United's anticipatory repudiation of an agreement in which United licensed

---

* Honorable John R. Bartels, Senior Judge of the United States District Court for the Eastern District of New York, sitting by designation.

Record Club to sell recordings made by United or its subsidiaries. On appeal, United challenges, *inter alia*, the district court's calculation of damages and a number of its interlocutory decisions, including its rulings (1) that Record Club had not materially breached the licensing agreement by failing to make certain royalty payments, (2) that Record Club had adequately exercised its option to renew that agreement, and (3) that the question of whether Record Club would have been willing and able to perform the agreement in the absence of repudiation by United was immaterial. Finding merit in United's challenges to the interlocutory rulings, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

The following facts do not appear to be in dispute. To the extent pertinent here, United was a corporation engaged in, *inter alia*, the manufacture, licensing, and sale of recordings. It operated in part through two wholly-owned subsidiaries, All Disc Records, Inc. ("All Disc"), and Liberty/UA Tape Duplicating, Inc. ("Liberty").

Record Club was engaged in the business of selling recordings through the mail. Operating as a club, Record Club acquired members through advertising and direct mail solicitation. A Record Club member, upon payment of a one-time membership fee, was entitled to receive a number of "bonus" records and gained the right to purchase additional records at discounted prices.

In October 1970, as part of the settlement of an antitrust suit brought by Record Club against United and other record companies, Record Club and United entered into the licensing agreement ("Agreement") that is at issue in the present litigation. Record Club entered into agreements with All Disc and Liberty to supply it with the necessary products.

### A. *The Licensing Agreement*

The Agreement granted Record Club a nonexclusive license to advertise, manufacture, and distribute by mail United-licensed recordings in the form of phonograph records, tape cassettes, and eight-track cartridges (collectively "albums"). The Agreement allowed Record Club to distribute a quantity of United albums as bonuses or on any other free basis (collectively the "frees") without paying United a royalty on them.

Record Club guaranteed United certain minimum levels of royalties over the life of the Agreement, agreeing to royalty rates for each United album sold and for each "excess" free album distributed by Record Club. Excess frees were defined as the number of United albums given, rather than sold, to prospective Record Club members in excess of one half of the total number of United units distributed, whether given away or sold:

> Record Club shall have the right to distribute on a bonus or free basis without payment of royalty hereunder one-half of all Licensed Albums distributed hereunder during the term hereof. All Licensed Albums which may be distributed on a bonus or free basis in excess of such amount shall be treated as "sold" for purposes of this agreement.

The Agreement required Record Club to maintain accurate records as to sales and free albums distributed and to provide United with a royalty statement within 45 days after the end of each calendar quarter:

> Record Club shall maintain accurate records with respect to all Licensed Albums distributed hereunder and, within 45 days after the end of each calendar quarter, it shall furnish to Licensor a complete and accurate royalty statement with respect to such calendar quarter and shall simultaneously pay to Licensor any amount due hereunder with respect to such quarter.

These royalty statements were to set forth, with respect to each licensed United album, the list price, the royalties earned, the total number sold, and the total number otherwise distributed. The Agreement gave United the right to audit Record Club's books.

The Agreement became effective on October 1, 1970, and was to expire on September 30, 1973. Record Club was given two options to renew, each for an additional two-year period. In order to exercise a renewal option, Record Club was required to notify United in writing at least 90 days prior to the expiration of the then-current term.

## B. The Controversy over Nonpayment for Excess Frees and the Purported Exercise of the Renewal Option

In the fall of 1971, United conducted an audit of Record Club's records for the period ending June 30, 1971, the close of Record Club's fiscal year. In May 1972, United wrote Record Club asserting that Record Club had breached the Agreement by failing to maintain accurate records as to inventory and distribution of records and by failing to pay royalties due on the excess frees it had distributed.

Thereafter, representatives of the two companies met and discussed their differences. United maintained that the Agreement had been breached by Record Club's failure to pay royalties on excess frees on a quarterly basis. Record Club contended that the Agreement did not require payment of royalties on excess frees until the end of the initial term of the Agreement. United suggested a renegotiation of the terms of the original Agreement. Though there followed discussions and correspondence with respect to such a renegotiation, no new agreement was reached.

In the ensuing correspondence, United reiterated its position that the original Agreement was ended on account of Record Club's breaches and stated that unless the matter were resolved, United would cease to provide production materials to Record Club. Record Club soon began removing mention of United recordings from its mail order guides and ceased its national advertising of United albums. It continued, however, to place orders with United, and United continued to fill most of them. As a result of the inventory accumulated from United's continued filling of its orders, Record Club resumed offering United products in its mail order guides and continued these promotions through the end of 1973—a year after the commencement of the present litigation.

In the meantime, in mid-August 1973, about six weeks prior to the expiration of the Agreement's initial term, United informed Record Club that Record Club had not given notice of exercise of its option to renew the Agreement. The Agreement permitted exercise of this renewal option at least 90 days before expiration of the initial term of the Agreement, i.e., by July 2, 1973. Record Club's vice president and general counsel George Port telephoned United's general counsel Mark Levinson to request that United accept Record Club's late exercise of its option. When Levinson refused, Port telephoned United's president Michael Stewart to request that he "reconsider on [Levinson's] position." Stewart refused. On or about September 7, 1973, Record Club sent United a letter stating Record Club's intention to exercise its option to renew the Agreement. United responded that "[t]he purported notice contained in [the September 7] letter under reply is clearly invalid and of no effect."

## C. The Decisions Below

Record Club commenced the present action in the district court in December 1972, seeking, inter alia, injunctive relief preventing United from refusing to provide Record Club with the materials necessary to manufacture albums, and a declaratory judgment that the Agreement remained in full force and effect and that Record Club was not required to pay royalties on excess frees prior to the expiration of the initial term of the Agreement. At about the same time, United filed an action in state court in California seeking, inter alia, a declaration that Record Club had breached the Agreement by failing to maintain complete and accurate books and by failing to pay royalties on excess frees on a quarterly basis. Eventually, the California action was transferred to the Southern District of New York and the two actions were consolidated.

The litigation proceeded in several stages, including early partial summary judgments, an eight-year hiatus while Record Club was in bankruptcy reorganization proceedings, and eventual bench trials separately on issues of liability and damages.

### 1. *The 1974 Summary Judgment Decision*

In early 1974, United moved for partial summary judgment principally (a) declaring that the Agreement had expired on September 30, 1973, because of Record Club's failure to exercise its renewal option within the time allowed by the Agreement, and (b) directing Record Club to account and pay for excess frees. United noted that the parties disagreed as to whether the Agreement had required Record Club to pay for excess frees on a quarterly basis, but that even under Record Club's interpretation that no payment for excess frees was due until after the September 1973 expiration of the initial term of the Agreement, United's 1974 motion to compel payment for excess frees was ripe.

Record Club opposed United's motion and sought affirmative relief with respect to its failure to timely exercise its option to renew. As to the renewal issue, Record Club urged that United's motion be denied because Record Club's "failure to deliver formal notice of its intention to exercise the option on [July 2] was entirely the result of honest mistake or an inadvertence." The accompanying affidavit of Port stated that "through human failure, I inadvertently let July 2 come and go." Arguing that United had nonetheless been aware of Record Club's desire to continue the license relationship, Record Club urged the court to "exercise its power, under Rule 56(d) to issue a declaration that the option to renew the Agreement shall be deemed to have been validly exercised."

In an unreported opinion dated July 30, 1974 ("1974 Opinion"), the court denied United's motion in large part and granted partial summary judgment in favor of Record Club. It ruled principally (1) that Record Club's notice of renewal was effective to extend the term, and (2) that Record Club had not breached the Agreement by failing to pay for excess frees on a quarterly basis.

As to the renewal issue, the court found that by reason of the negotiations for a new licensing agreement, United had been aware that Record Club wanted to exercise its option to renew the Agreement. It found that the failure to give timely notice was excusable, stating, in pertinent part, as follows:

> Here, I can readily believe the suggestion in Port's affidavit that his inadvertent failure to give the renewal notice at the specified time may have been due, at least in part, to defendant's insistence that the agreement had already been terminated as a result of plaintiff's alleged breach. From the fact that plaintiff was willing to consider a new contract calling for a higher royalty rate, it is obvious that defendant had caused plaintiff to fear that defendant might be right in asserting that the original agreement was no longer in effect, and that a notice of renewal would be a futile gesture.
>
> . . . .
>
> Here plaintiff not only had been led to believe that the notice of renewal might be ineffectual, but also, because the notice fell due at the time the parties were engaged in delicate negotiations for a new contract, plaintiff had cause to fear that giving the notice would upset the negotiations and deprive plaintiff of any opportunity to continue as a licensee in the event defendant's contention as to the breach of the agreement was upheld.

1974 Opinion at 15–16.

Before concluding finally that Record Club should be deemed to have timely exercised its option to renew, the court noted the need to consider whether the Agreement had required Record Club to pay for excess frees on a quarterly basis. If Record Club had, as United contended, breached the Agreement prior to 1973 by failing to pay for excess frees on a quarterly basis, even a timely notice of renewal would have been ineffective and the court could not, in that circumstance, deem the

late notice effective. Thus, the court proceeded to the question of whether the Agreement required Record Club to pay for excess frees on a quarterly basis or instead allowed it to pay for excess frees at the end of the initial term of the Agreement. In addressing this question of timing, the court found the Agreement "silent as to when the royalty on the 'excess frees' was to be paid," and concluded that

the most likely interpretation would appear to be that the payment for the "excess frees" was to be made after the term. The only apparent alternative would be to readjust every quarter the royalties previously paid on the "excess frees"—an improbable exercise in micrology.

Neither party has suggested that there is any custom in the trade, or anything in the negotiation of the agreement or in the performance of the parties under it, which would assist the Court in resolving the ambiguity. Indeed, the parties in their papers did not even inform the Court which of them had drafted the agreement, although the Court has, upon inquiry, since been informed that the agreement is the end result of a number of successive drafts which were the subject of extensive negotiations. However, since the claimed obligation to pay royalties quarterly on the "excess frees" would obviously benefit the defendant, it had the responsibility for insuring that any such obligation was clearly spelled out, so that the ambiguity of the agreement in this respect should logically be resolved against it....

I therefore conclude that the agreement had not been breached by plaintiff's failure to pay royalties on the "excess frees" prior to the expiration of the original three-year term. Whether it had been breached in other respects, as defendant asserted in its letter of May 18, 1972, we cannot determine from the present record. That issue will have to await a full trial on the merits.

1974 Opinion at 17–18.

Having found that Record Club's failure to pay for excess frees on a quarterly basis did not breach the Agreement, the court ruled that Record Club's "notice of renewal mailed September 7, 1973 was effective to extend the license agreement for a period of two (2) years to and including September 30, 1975." *Id.* at 22. It denied United's motion for an accounting and payment for all excess frees distributed over the entire initial term of the Agreement but ruled that United was entitled to an accounting and payment for excess frees "to and including July 27, 1972 (or any earlier date on which defendant first refused a request from plaintiff for materials for the production of licensed albums)." *Id.*

These 1974 rulings on summary judgment were the last in the case until the 1980's. On December 23, 1974, Record Club filed a petition in bankruptcy court, and the present action was placed on the district court's suspense docket, where it remained until 1982.

### 2. *The 1986 Liability Trial Decision*

Following resumption of proceedings in the district court, the court held bifurcated bench trials on the issues of liability and damages. On the liability issues, the court ruled largely in favor of Record Club.

In an opinion published at 643 F.Supp. 925 (1986), the court found that Record Club had established by a preponderance of the evidence that United had anticipatorily repudiated its Agreement with Record Club on at least four occasions, beginning with its June 6, 1972 assertion that Record Club was in breach. In arriving at this conclusion, the court rejected United's contention that repudiation was justified because of alleged Record Club breaches, noting that it had held in its 1974 summary judgment decision that "royalties for the so-called 'excess frees' were not due until the end of the initial term of the agreement," *id.* at 938, and finding, *inter alia*, that Record Club's books and records had been kept accurately. The court concluded that there had been no valid basis known to United for its repudiation and that the repudiation had neither been withdrawn by United nor forgiven by Record Club.

### 3. *The Damages Decisions*

Following the court's rulings on liability, United moved for partial summary judgment in an effort to limit Record Club's recovery of damages. United pointed out that the Agreement required Record Club to make payment to United of a guaranteed minimum royalty on October 1, 1973, in order to exercise its option to renew—an interpretation Record Club did not dispute. United argued that in light of, *inter alia,* Record Club's failure to make this payment and its filing for bankruptcy, Record Club was not entitled to damages for any period subsequent to the September 30, 1973 expiration of the initial term of the Agreement because it plainly was either unwilling or unable to perform its obligations under the Agreement. In an opinion reported at 80 B.R. 271 (1987), the district court found the cited factors irrelevant. It reasoned that United's prior repudiation excused further performance on Record Club's part and entitled Record Club to withhold the guaranteed payment as a setoff against damages, ruling that "the willingness and ability to perform need not continue after the repudiation." *Id.* at 276. Accordingly, the court denied United's motion to preclude the recovery of damages for the judicially extended term of the Agreement.

Following a 1988 bench trial on the damages issues, the court awarded Record Club damages principally for profits lost because of its inability to continue distributing United albums. The court rejected Record Club's demand for damages on certain of its other claims, including claims for diminution of its value as a going concern and for lost membership fees and lost profits on purchases that it contended would have been made by persons who might have become members of the Club but for United's conduct.

After deducting certain setoffs due United and adding prejudgment interest, the court awarded Record Club $3,518,865.36, and ordered a final judgment entered pursuant to Fed.R.Civ.P. 54(b). United has appealed, challenging several of the court's rulings. Record Club filed a cross-appeal which has not been pursued.

## II. DISCUSSION

On appeal, United contends principally that the court erred in its 1974 summary judgment rulings (a) that Record Club's late exercise of the renewal option was excused and (b) that the Agreement did not require Record Club to pay royalties for excess frees on a quarterly basis. United also challenges the court's 1986 finding that Record Club's record-keeping was adequate, the 1987 ruling that any inability or willingness on the part of Record Club to perform after September 30, 1973, was irrelevant, and a number of the 1988 calculations as to damages.

We reject United's challenge to the court's finding, after trial, that Record Club's record-keeping did not breach the Agreement, since we conclude that that finding was based on a permissible view of the evidence, and on the court's assessment of its probative value, and hence was not clearly erroneous. *See, e.g., Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Nonetheless, we conclude for the reasons below that the court improperly granted summary judgment with respect to the renewal and excess frees issues, and that the matter must be remanded for further proceedings.

### A. *Summary Judgment With Respect to Excess Frees*

■ The cornerstone of Record Club's recovery in this case is the district court's 1974 summary judgment ruling that Record Club did not breach the Agreement by failing to pay for excess frees on a quarterly basis because such payments were not required by the Agreement. We conclude that summary judgment on this issue was inappropriate.

■ Summary judgment as to the meaning of a contract term may not be granted when the term's meaning is not clear or is reasonably susceptible to more than one interpretation. "Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of

fact. Summary judgment is therefore inappropriate." *Bank of America National Trust & Savings Association v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983).

██ In the present case, the district court recognized that the Agreement was "silent" as to when the royalties on excess frees were to be paid and that in this respect the agreement was "ambigu[ous]." On this appeal, the parties have advanced two quite plausible interpretations as to the required timing of payment for excess frees. Indeed, the court itself briefly adverted to these possibilities. Though the court termed one of the interpretations "improbable," it was not entitled to exclude that possibility as a matter of law. The question of which of the two plausible interpretations should be credited was a question of fact and could not properly be decided on summary judgment.

██ We also have some substantive difficulty with the court's decision on this issue. The objective of contract interpretation is to give effect to the expressed intentions of the parties. *See, e.g., Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d 169, 171–72, 350 N.Y.S.2d 895, 898–99, 305 N.E.2d 907, 909–10 (1973); *Morlee Sales Corp. v. Manufacturers Trust Co.,* 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280, 282 (1961); 4 S. Williston, *Williston on Contracts* § 600, at 280 (3d ed. 1961). Rules of construction such as the principle that in certain circumstances a contract may be construed adversely to the party that drafted it, *see, e.g., United States Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044, 1050 (2d Cir.1989); 3 A. Corbin, *Corbin on Contracts* § 559, at 262 (1960), are principles of last resort, to be invoked when efforts to fathom the parties' intent have proved fruitless. *See, e.g., United States Naval Institute v. Charter Communications, Inc.,* 875 F.2d at 1050.

██ In ruling in favor of Record Club, the court stated that since a requirement for quarterly payments "would obviously benefit" United, United "had the responsibility for insuring that any such obligation was clearly spelled out, so that the ambiguity of the agreement in this respect should logically be resolved against it." 1974 Opinion at 18. This rationale does not appear to relate to the intent of the parties. Nor does it invoke any traditional principle of contract law. Indeed, if an "obvious[ ] benefit" test were valid, the court could equally logically have ruled that since payment for excess frees only at the end of the initial contract term would obviously benefit Record Club, Record Club had the duty to see that this was clearly spelled out and that any ambiguity should thus be resolved against Record Club.

In urging affirmance of the judgment in its favor, Record Club asserts that the district court's 1974 resolution of the question of the timing of payment for excess frees was only a "preliminar[ ]y" decision. The record belies this characterization.

Several facets of the 1974 decision itself reveal that the court did not view the decision as merely preliminary or tentative. First, the ruling was unequivocal. It stated, without qualification, that the court "conclude[d] that the agreement had not been breached by [Record Club's] failure to pay royalties on the 'excess frees' prior to the expiration of the original three-year term." 1974 Opinion at 18–19. Moreover, the court went on to state that a full trial on the merits would be necessary as to whether the agreement "had been breached in *other* respects." *Id.* at 19 (emphasis added). In addition, the court entered an unqualified order stating that the late notice was effective to extend the Agreement. This ruling depended, as the court had noted, upon a finding that Record Club had not theretofore breached the Agreement by failing to pay for excess frees on a quarterly basis.

Further, though Record Club states, in support of its characterization of the 1974 decision as merely tentative, that at the liability trial in 1985, the court "received additional extrinsic evidence on" "the meaning of the 'excess free' provision in

the license agreement," the court's statements at and after that trial disclose that the court itself did not regard the question of timing as one that was open for litigation after 1974. Thus, early in that trial, the court stated, "I recall that I ruled in 1974 when the world was young that the royalties on the excess free records was [sic] not due until the end of the term...." Later, when Record Club's president was testifying as to how to determine how many frees were excess, and exploring the effect of periodic interim calculations, the court observed that, "[s]ince this computation isn't made until the end of the license period, throwing it back isn't going to change anything," and stated that "there is no requirement for payment on those otherwise distributed [*i.e.*, distributed other than by sale] on a quarterly basis."

Further, in rendering its 1986 decision following this trial, the court did not purport to make any findings of fact with respect to what the Agreement required as to the timing of payment for excess frees. Rather, it stated as background that "[i]n an Opinion and Order dated July 30, 1974, the Court held that royalties on 'excess free' distribution were not due on a quarterly basis as UAR had claimed." 643 F.Supp. at 935. Similarly, later in its 1986 opinion, the court rejected United's contention that its repudiation of the Agreement had been justified by Record Club's failure to pay for excess frees on a quarterly basis, repeating that "[i]n ruling on the parties' cross-motions for summary judgment in 1974, I held that royalties for the so-called 'excess frees' were not due until the end of the initial term of the agreement." *Id.* at 938. Finally, in its 1987 opinion rejecting United's post-liability-trial motion to limit Record Club's recovery of damages, the court reiterated that its 1974 opinion had "held that royalties on 'excess free' distribution were not due on a quarterly basis as UAR had claimed." 80 B.R. at 275.

We think it clear from the court's ruling in 1974 and its consistent statements thereafter that the court considered its 1974 summary judgment ruling to be dispositive. Since summary judgment as to what the

Agreement required with respect to the timing of payment for excess frees, and hence as to whether Record Club's nonpayment for them on a quarterly basis constituted a breach, was improper, we vacate the judgment and remand for further proceedings.

**B.** *Excusing the Late Exercise of the Renewal Option*

As indicated above, the district court properly held that before ruling that the late notice of renewal was effective to extend the term of the Agreement, it first had to rule that Record Club's failure to pay for excess frees on a quarterly basis was not a breach. Our vacation of the court's decision that this failure by Record Club did not constitute a breach means, of course, that the decision to excuse the late notice must also be set aside. More importantly, however, we conclude that even if Record Club had not breached, the court's decision to excuse the late notice was not authorized by New York law on the record before it, if at all. *See J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 397 N.Y.S.2d 958, 366 N.E.2d 1313 (1977) (*"J.N.A. Realty"*); *Soho Development Corp. v. Dean & Deluca Inc.*, 131 A.D.2d 385, 517 N.Y.S.2d 498 (1st Dep't 1987) (*"Soho Development"*); 1 S. Williston, *Williston on Contracts* § 87 (3d ed. 1957).

In *J.N.A. Realty*, the New York Court of Appeals noted, citing Williston, *inter alia,* that "[i]t is a settled principle of law that a notice exercising an option is ineffective if it is not given within the time specified...." 42 N.Y.2d at 396–97, 397 N.Y. S.2d at 960, 366 N.E.2d at 1316. The court indicated that equitable relief from the failure to give timely notice might nonetheless be granted, assuming it would not prejudice the innocent party, where the failure was the result of negligence or inadvertence, but that such relief is available only where there would otherwise be a forfeiture. Thus, the court noted that

[t]he major obstacle to obtaining equitable relief in these cases is that default on an option usually does not result in a forfeiture. The reason is that the

option itself does not create any interest in the property, and no rights accrue until the condition precedent has been met by giving notice within the time specified. Thus equity will not intervene because the loss of the option does not ordinarily result in the forfeiture of any vested rights....

*Id.* at 397, 397 N.Y.S.2d at 960, 366 N.E.2d at 1316. The court went on to distinguish cases involving realty from those involving other types of property:

when a tenant in possession under an existing lease has neglected to exercise an option to renew, he might suffer a forfeiture if he has made valuable improvements on the property. This of course generally distinguishes the lease option, to renew or purchase, from the stock option or the option to buy goods.

*Id.*, 397 N.Y.S.2d at 961, 366 N.E.2d at 1316.

The greater possibility of forfeiture in the context of real estate rights results principally from the fact that if the tenant has installed permanent fixtures in the property, they cannot, of course, be taken with him when he leaves. If those fixtures have value, the court may find that the inadvertent failure to have timely exercised the contractual option will work a forfeiture. Even in the landlord-tenant context, however, a forfeiture is not found lightly. In *Soho Development*, 131 A.D.2d at 386–87, 517 N.Y.S.2d at 500, the court noted that at least some of the fixtures installed by the tenant could be moved, that the tenant's good will did not depend on its remaining in the same commercial location, and that the cost of the fixtures had been incurred sufficiently early in the rental period to have been amortized and depreciated over the life of the lease. Thus, the court found that strict adherence to the requirement of timely exercise of the lease renewal option would not work a forfeiture, and it refused to rule the tenant's late notice of renewal effective.

Finally, the *J.N.A. Realty* and *Soho Development* courts noted several circumstances in which equitable relief to avoid a forfeiture might be granted. These included circumstances in which the renewal provision of the contract was ambiguous, or in which the landlord led the tenant to believe that renewal did not require timely notice. The *J.N.A. Realty* court made it clear beyond peradventure, however, that where the option provision of the contract was unambiguous and the landlord did not mislead the tenant, a tenant who has intentionally delayed should not be given equitable relief. *See* 42 N.Y.2d at 400, 397 N.Y.S.2d at 962–63, 366 N.E.2d at 1317–18; *id.* at 406, 397 N.Y.S.2d at 966, 366 N.E.2d at 1321 (Breitel, *C.J.*, dissenting).

■ Under these principles, which we recognize were most clearly stated by the New York courts in cases decided after 1974, we have several difficulties with the district court's 1974 ruling that Record Club's tardy notice was effective. First, the district court stated that Record Club "had been led to believe that the notice of renewal might be ineffectual," 1974 Opinion at 16, due to United's "insistence that the agreement had already been terminated as a result of plaintiff's alleged breach," *id.* at 15. The court stated that if Record Club had not actually breached the Agreement, "then plaintiff was mistaken in fearing that it had done so. Moreover, by incorrectly asserting a breach, defendant had contributed to that mistake." *Id.* at 17. To the extent that these statements were meant to constitute a finding that United had prevented Record Club from sending timely notice of exercise of its renewal option, such a finding, even if it were appropriate for summary judgment, is not sustainable on the record. Nothing in the Agreement or in United's conduct obscured the date by which notice was required, and the record precludes any inference that United led Record Club to believe an extension would be acceded to without the contractually required notice of renewal. It may be, as the court noted, that Record Club believed as a result of United's position that the sending of such a notice would be futile. And it may well be that United would have taken the position that the sending of the notice was ineffective. But no action or stance taken by United could

reasonably be construed as leading Record Club to believe that an extension would be effective without timely notice of renewal, and no action or position by United prevented the sending.

■■■ Second, in fathoming Record Club's reasons (a matter that was inappropriate for summary judgment, *see, e.g., Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559–60 (2d Cir.1989) (summary judgment normally inappropriate where state of mind at issue); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989) (same)) for not giving timely notice, the court noted that Record Club may well not have sent timely notice "because the notice fell due at the time the parties were engaged in delicate negotiations for a new contract, [and] plaintiff had cause to fear that giving the notice would upset the negotiations." 1974 Opinion at 16. Assuming, *arguendo,* that the New York courts would grant the type of relief at issue here in a case involving goods rather than realty, they surely would not grant it on this basis. If Record Club did not send timely notice because it was afraid of the effect notice might have on delicate negotiations, that was not a matter of inadvertence but rather was a matter of choice based on its assessment of where its best negotiating interests lay. In such circumstances, the court should not exercise its equity powers to relieve a party from the contractual consequences of choices knowingly made.

■■■ Third, even if it had been established that the sole reason for Record Club's failure was an inattention to dates, rather than a reluctance to upset delicate negotiations, the record was inadequate to warrant equitable relief, for the court could not properly excuse the late notice unless enforcement of the contract provisions would cause Record Club to suffer a forfeiture. Though the court stated that Record Club would suffer a "punishing forfeiture," *id.* at 17, Record Club made no showing of forfeiture. The only statements in Record Club's moving papers as to the threat of loss were conclusory statements that the failure to excuse its tardiness would "deprive Record Club of the substantial economic benefits of the license agreement," and of its "hard-won and valuable rights under the licensing Agreement," and the rather circular argument that "serious consequences" would be "visited upon [it] if a forfeiture were declared." We have seen in the record no indication that Record Club made any showing sufficient to warrant characterization of its loss as a forfeiture.

Finally, we think it highly unlikely that Record Club could, in the business context at issue here, show a forfeiture as that concept is used in the pertinent New York cases. Certainly there is no obvious forfeiture. Any physical or tangible property acquired by Record Club during its dealings with United may remain the property of Record Club. Since this is not a real estate matter, there are no "improvements" that must be left behind. Rather, it is a matter of an inability to buy goods from a particular purveyor. We are not aware of any New York case in which a forfeiture has been found in circumstances such as these. Indeed, the New York Court of Appeals in *J.N.A. Realty* noted that the real estate cases are different from cases involving securities or goods precisely because when real estate is involved there may be a forfeiture. We seriously doubt that the New York courts would deem the loss of a relationship with a licensor or vendor a forfeiture.

Though we are thus skeptical that Record Club will be able to make a showing bringing itself within the circumstances in which New York law recognizes a forfeiture warranting modification of the contract, we conclude that, in light of the summary disposition of this issue, the matter should be remanded for further proceedings.

### C. *On Remand*

In light of our conclusion that the matter must be remanded for trial (1) as to whether Record Club breached the Agreement by failing to pay for excess frees on a quarterly basis and, (2) if it did not so breach, as to whether enforcement of the renewal option

provision would work a forfeiture within the meaning of New York law, and in light of our skepticism that New York law permits the court to excuse a late notice of renewal in circumstances such as these, we need not address in detail the remaining issues raised by United on this appeal. Two matters warrant brief mention, however.

■ First, on the issue of the Agreement's requirement for timing of payment for excess frees, Record Club, as the plaintiff seeking damages for United's alleged anticipatory repudiation, has the burden of proof. *See British American & Eastern Co. v. Wirth Ltd.*, 592 F.2d 75, 78 (2d Cir.1979) ("New York law ... clearly places the burden of proving performance in an ordinary contract action upon the plaintiff...."); 3A *Corbin on Contracts* § 655, at 143. Record Club was required to, and did, plead that it "ha[d] complied with all of its obligations under the Agreement." In order to recover any damages, it must establish by a preponderance of the evidence that the Agreement did not require it to pay for excess frees on a quarterly basis.

■ Second, though a party need not continue to perform the contract after the other party has anticipatorily repudiated it, he must nonetheless demonstrate that he had the willingness and ability to perform before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated. *Decor by Nikkei International, Inc. v. Federal Republic of Nigeria*, 497 F.Supp. 893, 908 (S.D.N.Y.1980) (applying New York law), *aff'd sub nom. Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Ufitec, S.A. v. Trade Bank & Trust Co.*, 21 A.D.2d 187, 190, 249 N.Y.S.2d 557, 560 (1st Dep't 1964), *aff'd*, 16 N.Y.2d 698, 261 N.Y.S.2d 893, 209 N.E.2d 551 (1965); 4 *Corbin on Contracts* § 978, at 925 (1951); *Restatement (Second) of Contracts* § 254, at 290 ("A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise."). This principle is merely

an application of the general rule that the complaining party must demonstrate that the breach caused him injury; "[t]o do this he must prove that he intended to and was able to perform when his performance was due." *Scholle v. Cuban–Venezuelan Oil Voting Trust*, 285 F.2d 318, 320 (2d Cir. 1960).

Thus, if Record Club carries its burden of showing that the Agreement did not require it to pay for excess frees on a quarterly basis, and if it carries its burden of showing that enforcement of the Agreement's deadline for giving notice of exercise of the renewal option would work a forfeiture on it, it must also show, before it may be awarded damages for any period after September 30, 1973, that it would have been willing and able, absent United's repudiation, to perform its own obligations under the Agreement during that extended period.

In light of the uncertainty of the outcome with respect to liability, we decline at this time to address the challenges made by United with respect to the district court's computation of damages.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.

Costs to defendant.