**POINT PRODUCTIONS A.G., Plaintiff,**

**v.**

**SONY MUSIC ENTERTAINMENT, INC., Defendant–Counterclaimant,**

**v.**

**Phonomatic Group, A.G. and Wilhelm F. Mittrich, Additional Defendants on the Counterclaims**

**No. 93 Civ. 4001(NRB).**

United States District Court, S.D. New York.

July 29, 2002.

---

it evidence of the plaintiff's lost profits damages is granted, and therefore we need not reach defendant's motion to preclude.

Brandon T. Davis, Davis & Pfahl, New York City, Julian W. Friedman, Stillman & Friedman, PC, New York City, for Point Productions A.G.

Otto G. Obermaier, Weil, Gotshal & Manges, New York City, for Sony Music Entertainment, Inc.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff Point Productions A.G. ("Point" or "plaintiff") has brought this action for breach of contract against defendant Sony Music Entertainment, Inc. ("Sony" or "defendant"), claiming that, on January 21, 1993, defendant wrongfully terminated a licensing agreement the parties entered into on August 28, 1991 (the "Agreement"), because Sony failed to give Point notice of and an opportunity to cure alleged breaches. In an Opinion and Order dated July 20, 2000, we granted plaintiff's motion for summary judgment on liability, ruling that Sony had improperly terminated the Agreement in January 1993. *Point Prods. A.G. v. Sony Music Entertainment*, 2000 WL 1006236 (S.D.N.Y.2000). Discovery having been concluded, Sony has now moved in limine to limit evidence of plaintiff's damages at trial to the period before plaintiff declared bankruptcy on August 30, 1995, and to exclude the testimony of one of plaintiff's proposed damages experts, Graham Churchill. For the reasons discussed below, defendant's motion to lim-

## BACKGROUND [1]

The facts surrounding the formation and termination of the Agreement are set out in our Opinion and Order of July 20, 2000. More relevant to the present motions is that, after signing the Agreement with Sony in August 1991, the affiliated companies of the Phonomatic Group A.G., including Point, suffered a series of financial setbacks and that Point itself ultimately declared bankruptcy in 1995.

Point was part of the Phonomatic Group, which consisted of a series of intricately connected companies, from several countries, at all levels of the production and distribution chains of the music industry. Plaintiff was a Swiss company that obtained licenses, such as the one at issue in this case, to reproduce and sell music.[2] Its sister companies, which carried out similar functions within the Phonomatic Group, included a Dutch company, Point Productions B.V., an American company, Point Productions, Inc., and Point Classics ("Point affiliates").

The Point affiliates used other Phonomatic companies to both manufacture and distribute their products. The manufacturing affiliates included Sonortape Nederland B.V. ("Sonortape") and Merit Manufacturing ("Merit"). Merit manufactured much of plaintiff's product and apparently was the most profitable Phonomatic subsidiary, providing working capital for the other affiliaties. Affidavit of Wilhelm Mittrich ("Mittrich Aff.") ¶ 3a. At the

---

1. Unless otherwise noted, the facts in this section are drawn from the parties' supporting affidavits. Citations to the deposition of Wilhelm Mittrich are located in Ex. J to the Affidavit of Julian Friedman or Ex. A to the Declaration of Ronald Rossi in support of

defendant's motion to preclude evidence of post-bankruptcy damages.

2. MCR Productions A.G. ("MCR"), Point's predecessor company and part of Phonomatic, actually signed the Agreement.

time the Agreement was signed, Sonortape had entered into a mechanical license agreement with Stichtung Stemra ("STEMRA"), the Dutch performing rights society, on behalf of entire Phonomatic Group. Deposition of Wilhelm Mittrich ("Mittrich Depo."), at 166:8–15. The license enabled all Phonomatic affiliates to lawfully manufacture and distribute copyrighted recordings anywhere in the European Union. Sonortape subcontracted the actual manufacturing of its compact discs to CD Music Pressing, which was, in turn, partially owned by Phonomatic. Sonortape "did the printing, packaging, licensing, warehousing and was, to the outside, the manufacturer." *Id.* at 173:23–174:7. It is not clear from the record whether Merit actually manufactured compact discs, or whether it, like Sonortape, outsourced this work.

Other Phonomatic companies handled the distribution and sales of the music licensed by the Point affiliates. Point Logistics was the "central warehousing and physical distribution company for the Phonomatic Group." *Id.* at 74:3–5. The Phonomatic Group also had its own sales affiliates. For example, plaintiff's predecessor, MCR, made 75% of its sales to Phonomatic affiliates, known as Sound Solutions. The other 25% of its sales were in countries where Phonomatic did not have a distribution company. *Id.* at 88:25–89:16.

The Phonomatic companies also shared common ownership. The multiple layers of ownership enabled the affiliated companies to set off profits and losses under Dutch law, reducing their tax liability. *Id.* at 84:6–16. For example, Point was 100% owned by Phonomatic Group A.G. *Id.* at 83:2–5. Point Productions B.V. was 100% owned by Laser Records B.V., which was 100% owned by Blazer Records, which, in turn, was 100% owned by Phonomatic. *Id.* at 83:6–15. Point Classics was 75% owned by Phonomatic. *Id.* at 81:10–14. Point

Productions, Inc. was wholly owned by Phonomatic and its American subsidiary. *Id.* at 83:16–84:5. In sum, the Phonomatic Group consisted of closely-associated companies with overlapping ownership. The entire group was controlled by Wilhelm Mittrich, plaintiff's former general manager, who owned approximately 50–60% of the shares of Phonomatic in 1992. Mittrich Depo. at 82:20–22.

Point's financial troubles began in November 1992, when STEMRA terminated Sonortape's mechanical copyright license over disputed royalty payments. STEMRA applied this termination to all Phonomatic companies, including Merit, thus preventing Point from making any legal music reproductions. Sony relied on STEMRA's action to terminate the Agreement with Point, which obligated Point, under § 3.04, to maintain a valid mechanical copyright license. On October 14, 1994, Sonortape apparently won its appeal to the Dutch Supreme Court, which held that STEMRA wrongfully terminated the license, although the parties dispute the actual significance of that decision. *See Point Prods.*, 2000 WL 1006236, at *2 n. 7. Regardless of the ultimate outcome, the initial termination required Point to obtain a new mechanical license in order to continue operations. Moreover, shortly after STEMRA's termination of the Sonortape license, in January 1993, Point was expelled from MIDEM, an annual music industry trade show attended by 8,000 to 10,000 participants from all over the world, amid allegations of copyright violations. According to Mittrich, the MIDEM trade show is very important for proper product marketing. Consequently, the MIDEM expulsion adversely affected Point's ability to market its products. Mittrich Depo. at 805:24–807:3.

Seeking to replace its reproduction license, in January 1993 Point signed a re-

production agreement with Start Audio & Video, Ltd. ("Start"), which agreed it would obtain a license through MCPS, the British performing rights society. The agreement between Start and Point quickly dissolved, however, because MCPS refused to license any product for Point until STEMRA had resolved its dispute with Sonortape and the other Phonomatic affiliates. Point did eventually obtain a mechanical license through the Swiss performing rights society, SUISA, although it never released any music under that license.

Amidst Point's troubles with obtaining a copyright license and its MIDEM expulsion, many of Point's affiliates within the Phonomatic Group were in severe financial difficulties. Merit, the manufacturer for Point, entered bankruptcy in November 1993. As noted earlier, Merit was the most profitable company of the Phonomatic Group and generated working capital upon which its affiliates depended. Phonomatic itself, plaintiff's parent company, went bankrupt in December 1993. As of June 30, 1992, Phonomatic owed Point 6.5 million Swiss Francs.[3] Also in December 1993, Point Logistics, plaintiff's warehouse and distribution affiliate, went bankrupt, and its creditors seized "a couple of million CDs and tapes" that were held by Point Logistics for plaintiff. Mittrich Depo. at 75:7. As a result, plaintiff was unable to sell the inventory that had been in Point Logistics' warehouses. In early 1994, Phonomatic's bankruptcy resulted in Point's placement into receivership. Point ceased operations in October 1994. Mittrich Aff. ¶ 3. Finally, in August 1995, Point itself filed for bankruptcy in Switzerland.

In the Swiss bankruptcy court, Point's legal representative, Walter Studer, identified the collapse of the Phonomatic companies as having a "negative influence" on Point. Affidavit of Walter Studer ¶ 6. Indeed, this was the only reason listed on the bankruptcy report of the Swiss Court. Rossi Decl. Ex. C.

We granted plaintiff's motion for summary judgment on liability on the grounds that Sony's termination of the Agreement constituted a breach of contract because Sony failed to provide Point with notice and an opportunity to cure. *Point Prods.*, 2000 WL 1006236, at *5. After that ruling, the parties completed discovery. On February 15, 2002, Sony filed two motions in limine: the first seeks to exclude any evidence of lost profit damages claimed for the period after plaintiff declared bankruptcy; the second seeks to preclude the testimony of Graham Churchill, plaintiff's proposed expert on lost music sales. We held oral argument on the motions on May 14, 2002.

### DISCUSSION

### I. Motion to Exclude Post–Bankruptcy Damages Treated as Motion for Partial Summary Judgment

■ Although Sony styled its motion to exclude evidence of plaintiff's post-bankruptcy damages as a motion in limine, when a motion in limine seeks to limit damages, it is treated as a motion for partial summary judgment. *Barnes Group v. United States*, 872 F.2d 528, 532 (2d Cir.1989). Accordingly, we apply the familiar summary judgment standard of Fed.R.Civ.P. 56(c) to this motion and view all evidence in the light most favorable to the non-moving party. *See, e.g., Pappas v. Giuliani*, 118 F.Supp.2d 433, 436–37 (S.D.N.Y.2000).

---

**3.** As of June 30, 1992, 1 Swiss Franc was worth approximately 73 U.S. cents. 6.5 million Swiss Francs would have been worth approximately $4.745 million. *See* FXHistory: Historical Currency Exchange Rates, *http://www.oanda.com/convert/fxhistory* (June 7, 2002).

## II. Liability for Post–Bankruptcy Damages

Defendant's motion to exclude the post-bankruptcy damages is based on § 4.02 of the Agreement, which permitted Sony to terminate the contract without notice and opportunity to cure in the event of Point's failure to make the payments set out in the Agreement within 20 days of their due dates. Sony also relies on the maxim of contract law that a party's duty to pay damages is discharged if it appears that the other party would have been totally unable to perform its obligations under the contract. *Record Club of Am., Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir.1989) (holding that the plaintiff must prove that it would have been able to meet its obligations under the contract in order to win a suit for breach of contract); *Restatement (Second) of Contracts* § 244 ("A party's duty to pay damages for total breach by non-performance is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise."). Sony contends that Point's bankruptcy discharged its duty to perform because plaintiff would have been unable to perform its obligations under the contract.

Point, for its part, contends that Sony may not rely on this rule because Sony's actions were a "significant factor" in causing plaintiff's bankruptcy, and Sony should not be able to benefit from the consequences of its breach. Pl. Opp. at 16. Therefore, Point claims, Sony should be estopped from arguing that it is not responsible for post-bankruptcy damages and that the jury should consider evidence on damages through the full term of the contract. Point wants the jury to be able to consider its claimed lost profit damages through the length of the contract, including the three year option held by plaintiff.

### A. Applicable Test for Causation

■ Whether Sony is responsible for plaintiff's post-bankruptcy damages depends on whether its breach can be said to have caused the bankruptcy. This determination, in turn, depends on the proper test for damage causation in a breach of contract action. Plaintiff argues that the appropriate test for causation is the "substantial factor" test. Defendant instead contends that the Court must determine that the initial breach was a "but for" cause of the harm.

■ The causation requirement in contract law is similar to that in tort law. *See* 3 E. Allan Farnsworth, *Contracts* § 12.1, at 148 (2d ed.1998). In order to make out a prima facie negligence case, a plaintiff must prove that the defendant's negligent act or omission was both the cause in fact and the proximate cause of the plaintiff's injury. *See also* Charles McCormick, *Handbook on the Law of Damages,* § 73, at 261 (1935) ("The necessity of establishing a causal connection between the defendant's conduct and the harmful consequence is equally present in cases of breach of contract as in the field of wrongs."). The same requirements appear in securities and RICO cases. *See, e.g., Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) (RICO cases); *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 186 (2d Cir.2001) (securities cases).

■ In a breach of contract action, the plaintiff must demonstrate more than simply that defendant breached its contract and that the plaintiff suffered damage. Plaintiff cannot recover if it would have suffered the harm regardless of defendant's actions. *Cf. Ordonez v. Long Island R. Co.,* 112 A.D.2d 923, 925, 492 N.Y.S.2d 442, 443 (2d Dep't 1985) (holding that a negligent defendant cannot be held liable if the accident would have occurred absent

his negligence because the required element of causation is then lacking).

■ The cases cited by plaintiff focus on the "substantial factor" test, which is used by some courts as a substitute for "but for" causation when there are multiple potential causes of an injury. Under tort law, where there is an issue of multiple potential causes of plaintiff's harm, the court can use a substantial factor test in place of but for causation in order to determine the cause in fact of the injury. However, applying this test requires that each individual action was "sufficient standing alone to cause the same harm." 1 Dan B. Dobbs, *Law of Torts* § 171, at 415 (2001). In essence, this test allows a court to avoid having to determine precisely which one of multiple causes actually caused the injury where each defendant's actions alone are sufficient to constitute liability.

Plaintiff relies heavily on *Coastal Power Int'l v. Transcontinental Capital Corp.*, which held that "[i]n the law of contracts, as in torts, causation in fact is established if the defendant's breach of duty was 'a substantial factor in producing the damage.'" 10 F.Supp.2d 345, 366 (S.D.N.Y. 1998) (quoting *Krofft Entertainment, Inc. v. CBS Songs*, 653 F.Supp. 1530, 1534 (S.D.N.Y.1987)). While relying on that statement of law, plaintiff fails to acknowledge the level of causal relationship the substantial factor test actually requires. Plaintiff suggests in its papers that it is sufficient that an action be a "contributing cause" of the harm. Pl. Opp. at 14.

A careful examination of the *Coastal* decision, however, reveals that the court found a strong causal relationship between the breach and the damages. The *Coastal* plaintiffs, purchasers of a floating power plant in the Dominican Republic, sued the company that built and sold them the plant. Both before and after construction, defendant, the builder, failed to provide the insurer with adequate information re-

garding the storm and soil conditions at the plant site. As a result, the insurer threatened to cancel the policy several days before the sale from defendant to plaintiffs closed and did, in fact, cancel the policy the day after the sale closed on the grounds that the plant would not have survived a major storm. The plaintiffs had to pay a higher premium to restore insurance for the plant and undertook expensive modifications to secure the plant once it became aware of the relevant storm and soil data. Plaintiffs sued for the cost of the higher premiums and the full cost of the modifications to the plant on the grounds that defendant violated the contractual provisions requiring defendant to give notice of any fact that could have a material adverse effect upon the plaintiffs. 10 F.Supp.2d at 347–359. Defendant contended that plaintiffs' damages were too remote to be its responsibility and that plaintiffs had not established that the breaches of the contract were a but for cause of plaintiffs' damages. *Id.* at 364.

The court in *Coastal* used the substantial factor test to determine whether plaintiffs had demonstrated that the defendant was the cause in fact of their injuries. Under *Coastal*, "the test is satisfied if the defendant's actions would be thought of by people generally as having operated to an important extent in producing the harmful result." 10 F.Supp.2d at 366 (internal quotation omitted). The court found that the builder's failure to provide the environmental data to the insurer prevented the full scope of the insurance problem to be known before the closing, materially affecting the plaintiffs. Had the builder not breached its contractual obligation, the buyers would have known about the problem much sooner and would have had time to properly assess their options. *Id.* at 365. In determining whether the breach was the cause in fact of plaintiffs' damages, the court ruled that the increased insur-

ance costs were "natural and probable consequences" of the builder's breach even though the breach was not the exclusive cause of the increased premiums. *Id.* at 366. The court further held that, because the builder's failure to provide information to the insurer had sharply limited the plaintiffs' options in dealing with the insurer's threatened cancellation, the builder's breach "although obviously not the sole cause of the modifications, operated to an important extent in producing the harmful result. Accordingly, they were a cause in fact of Coastal's injury." *Id.* at 367 (internal quotation omitted). Moreover, the *Coastal* court referred to the harm suffered by the breach as an "inevitable event." *Id.* at 366.

■ The court in *Coastal,* applying the substantial factor test, found that factual causation was clear, even though it could not be stated with absolute certainty that the defendants' actions had caused all of the harm suffered by the plaintiff because there were other factors that may have contributed to the damage, particularly plaintiffs' decision to undertake costly modifications that might not have been necessary. *Coastal,* 10 F.Supp.2d at 366. However, unlike tort law, contract law does not provide for proportional liability among potentially culpable parties. *See Macmillan, Inc. v. Federal Ins. Co.,* 764 F.Supp. 38, 41 (S.D.N.Y.1991) ("A right of contribution will not be implied in actions arising solely from breach of contract."). Therefore, when there are multiple potential causes of a plaintiff's injury, the plaintiff is still required to present evidence of a causal relationship between a defendant's actions and the harm suffered. *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 537–38 (applying the substantial factor test and holding that while plaintiff does not have to prove that defendant was the exclusive cause of its injury, it must still present evidence of causation). Thus, the burden remains on the plaintiff

in a contract case to prove that the defendant's breach was a significant, if not the exclusive, cause of the injury. In *Coastal,* the court recognized that defendant's conduct may not have been the exclusive cause of plaintiff's damages and that the insurance premiums might have been lower but for certain other factors, but it still found that there was a strong enough causal link between the builder's breach and the plaintiffs' damages to hold the defendant liable for the entire amount.

The strong causal relationship required in *Coastal* is drawn directly from *Krofft Entertainment,* in which Judge Connor held that an act or omission can ordinarily only be a substantial factor of plaintiff's injury if the plaintiff has demonstrated factual causation "'where the damage would not have occurred but for the alleged wrongful act or omission.'" 653 F.Supp. at 1534 (quoting McCormick, *Handbook on the Law of Damages* § 73, at 261).

In *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* Judge Sweet, citing his decision in *Primavera,* wrote:

> Under New York law, a plaintiff must prove that its injury was proximately caused by the defendant's breach. Accordingly, the Funds must prove that but for the allegedly wrongful margin calls, the injury they suffered through the liquidation of their securities could not have occurred. Thus, if the injury would have occurred in the absence of the margin calls on March 31, the element of "but for" causation is lacking.

2002 WL 826956, at *5 n. 5 (S.D.N.Y. May 1, 2002) (internal citation omitted). Both *Coastal* and *Primavera,* cited by plaintiff to support its contention that the substantial factor test is weaker than the but for causation test, strongly suggest that the only difference between the two tests is

that, when there are multiple potential causes, the substantial factor test accounts for the possibility that other causes may have contributed to plaintiff's injury. A plaintiff must still prove that a defendant's breach of contract was sufficiently connected to the plaintiff's damage that it could reasonably be said to have caused the injury, that is, that defendant was the cause in fact of plaintiff's damages. There is, therefore, little distinction in practice between the substantial factor and but for causation tests.

Our reading of the causation standard required in a breach of contract action accords with the standard set out by the Second Circuit in *LNC Investments, Inc. v. First Fidelity Bank,* which held that "'[w]here the remedy sought is damages to compensate for a claimant's loss, the usual damages-causation rule for tort and contract breach cases is appropriate.'" 173 F.3d 454, 465 (2d Cir.1999) (citing *American Fed. Group, Ltd. v. Rothenberg,* 136 F.3d 897, 907 n. 7 (2d Cir.1998)). The Second Circuit went on to distinguish situations where a plaintiff seeks restitution damages for a defendant's breach of a fiduciary duty, in which the traditional causation rules do not apply and the plaintiff need only show that defendant's conduct was a substantial cause of the harm. *Id.*

Accordingly, in order to show that Sony's breach caused Point's bankruptcy, plaintiff must establish a direct causal relationship. In order to hold Sony liable for the damages that occurred post-bankruptcy, Point would have to show either that Sony's breach alone would have been sufficient to force the company to declare bankruptcy or that Point would not have had to declare bankruptcy but for Sony's breach. If Point's bankruptcy was inevitable regardless of Sony's breach, then Sony cannot be held responsible for that injury. *See Ordonez,* 112 A.D.2d at 925, 492 N.Y.S.2d 442. The burden on Point is to prove that Sony's actions forced Point to file for bankruptcy protection.

## B. Causes of Point's Bankruptcy

■ Having determined the proper standard of causation, we apply it to the current situation to determine whether plaintiff has proven that Sony's breach was the cause in fact of its bankruptcy, thus permitting it to introduce evidence of post-bankruptcy damages.

At oral argument, plaintiff was unable to point to sufficient evidence in the record that could persuade any reasonable jury that Sony's actions caused Point's bankruptcy. Point's counsel referred to the testimony of Wilhelm Mittrich and an expert, Mr. Jeffrey, to demonstrate that Point Productions could have remained solvent through the length of the contract had Sony not breached. Leaving aside the fact that Mr. Jeffrey's testimony has not been submitted to the Court for purposes of this motion, Point's counsel conceded that it did not have any expert testimony to prove that the projected profits under the Agreement would have been high enough for Point to avoid bankruptcy or indeed any analytical evidence demonstrating Point's ability to remain solvent in the face of the collapse of its affiliated companies. *See* Oral Argument Transcript, May 14, 2002 ("Tr."), at 27 (admitting that plaintiff's experts did not know enough about Point's financial condition to assess whether it would have remained solvent).

Plaintiff's counsel further conceded that Mr. Mittrich's testimony was the only evidence of Point's ability to remain solvent in spite of the Phonomatic Group's collapse, but that his deposition testimony was based only on the financial information for 1991 and 1992, as he did not have projections for sales under the Agreement for the years from 1993 through the end of the contract on which to base his assertions. Tr. at 30, 46. In this regard, it should be

noted that Point failed to submit financial statements for its fiscal year ending June 30, 1993, even though it was still in business. All Mittrich could say was that Phonomatic's bankruptcy "aggravated [Point's] already precarious financial position." Mittrich Aff. ¶ 1(d). Plaintiff contends that Sony's breach prevented it from resuming its prior business because of the conditions imposed by Sony in order to make the Agreement. However, no such conditions appear in the Agreement, which is unambiguous and fully integrated. Extrinsic evidence, therefore, cannot be considered. *See Stroll v. Epstein,* 818 F.Supp. 640, 645 (S.D.N.Y.1993). In short, the only support for plaintiff's assertions is the Mittrich affidavit.

Apart from the insufficiency of the Mittrich Affidavit, a review of the effects of the bankruptcies of the Phonomatic companies clearly demonstrates that Point's bankruptcy resulted from the collapse of its affiliated companies, rather than from Sony's breach. We state briefly the impact of the collapse of the other parts of the Phonomatic family on Point. Merit, which manufactured Point products and was a major source of working capital for Point and the entire Phonomatic Group, entered bankruptcy in November 1993. Without operating capital, Point would have lacked the resources to create major new products featuring its Sony-licensed titles. Point also would have had to find a new manufacturer, which likely would have charged higher production fees than Merit did. The demise of Point Logistics, in December 1993, had two effects on Point. First, as Point relied on Point Logistics for all of its warehousing and distribution needs, a new distributor would also have increased Point's production costs. However, even more important for Point's short-term financial health, when Point Logistics declared bankruptcy, its credi-

tors seized millions of units of Point product that Point Logistics had been holding for Point, consequently depriving Point of sales revenue. The collapse of Phonomatic, Point's parent company, and all of its subsidiaries denied Point access to the Sound Solutions sales affiliates. Given that 75% of Point's sales were conducted through these affiliates, Point's ability to market the Sony titles would have been seriously undermined, sharply curtailing its sales revenue. Finally, Phonomatic's bankruptcy meant that Point would likely never recover the debt Phonomatic owed it, which as of June 30, 1992, totaled almost five million dollars. Significantly, Point does not allege that Sony caused the Merit bankruptcy, which resulted from the STEMRA dispute and which caused Phonomatic and Point Logistics to collapse. Nor does plaintiff ever account for the damage to Point's sales and reputation that resulted from its expulsion from MIDEM.

Viewing these facts from another legal perspective, plaintiff's lost profit analysis lacks the requisite degree of certainty. Under New York law, plaintiff must establish lost profit damages with reasonable certainty. *Kenford Company, Inc., v. County of Erie,* 67 N.Y.2d 257, 262, 502 N.Y.S.2d 131, 493 N.E.2d 234 (N.Y.1986) (rejecting the plaintiff's lost profits analysis because "the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty.").

As noted above, plaintiff has produced no expert report to show that Point was likely to have remained solvent had Sony not breached. Without full consideration of the effects of the Phonomatic collapse,[4]

4. Apparently, Mr. Jeffrey's unsubmitted re-

port apparently accounted for very few of the

discussed *supra*, there exists substantial doubt as to the validity of Point's projected sales under the contract, which depended on significant increases over Sony's international sales of the same or similar titles. (Decl. of Frank Rossi, Ex. B, Report of Graham Churchill, at 11.) Given the significant unfounded assumptions underlying plaintiff's expert reports, we find plaintiff's lost damages claim to be highly speculative and insufficiently reliable to allow a jury to consider it.

Recognizing this weakness in their case, plaintiff contended at oral argument that, even if it cannot introduce evidence of lost profits through the length of the contract, its damages can be measured under the lost asset value method. In cases where the lost future damages are deemed to be too speculative to be determined with any reasonable certainty, courts have been willing to use this alternate measure of damages. *See Schonfeld v. Hilliard,* 218 F.3d 164, 175–177 (2d Cir.2000).

Given the lack of certainty surrounding plaintiff's losses as a result of Sony's breach, even during the period before Point declared bankruptcy, the *Schonfeld*

lost asset model permits the determination of a more certain form of damages.[5] In this case, the lost asset value is based on the contractual amount plaintiffs agreed to pay Sony. Therefore, the asset Sony denied Point would be the right to sell music under the Agreement from the date it was signed until the date Point would have stopped making its royalty payments. As the parties negotiated periodic payments under the Agreement, the asset would be worth no more than the total amount that Point would have paid Sony under the Agreement between August 1991 and October 1994, when Point ceased operations. Based on the payment schedule set out in § 4.02(a) of the Agreement, the payments to be made during that period total $900,000.[6] If Sony can prove that Point's financial constraints would have prevented it from making payments at a date even prior to when it ceased operations in October 1994, Sony's obligation to perform would have terminated on that earlier date.

In sum, Point's purported evidence is simply insufficient to meet its burden of showing that Sony was the cause-in-fact of

---

effects of the Phonomatic collapse described above.

**5.** It would be inappropriate in this case to hold defendant responsible for the uncertainty of plaintiff's lost profit calculations. In *Schonfeld,* the Second Circuit rejected the application of the "wrongdoer rule," which places the burden of the uncertainty of damages on the defendant, on the grounds that the rule only applies when the only uncertainty is as to the amount of damages, rather than the existence of damages. 218 F.3d at 174–75. In that case, there was uncertainty as to the existence of damages. *Id.* Similarly, due to Point's failure to account for its financial situation, it has not established with any certainty that it would have remained in business and made a profit had Sony not breached the agreement. This is unlike the situation in *Coastal,* where the wrongdoer rule did apply, because the only uncertainty was as to the

amount of damages, not to the existence of damages, because the breach of contract clearly caused plaintiffs' damages. *See* 10 F.Supp.2d at 369.

**6.** According to § 4.02(a) of the Agreement:

Upon execution of this Agreement, Sony Music shall be entitled to a royalty advance of $1,300,000 payable as follows:
  –250,000  prior to January 1, 1992
  –250,000  prior to April 1, 1992
  –200,000  per year for each successive year for 4 years, prior to January 1, of each year.

The payments due of $250,000 due on January 1, 1992, and April 1, 1992, as well as the payments of $200,000 due on January 1, 1993, and January 1, 1994, would all be included in the calculation of the total value of the asset, assuming Point would have continued making payments until it ceased operations.

its bankruptcy. Although all inferences are drawn in favor of the non-moving party in a motion for summary judgment, on the basis of the record before the court, no reasonable jury could find that Sony caused plaintiff's bankruptcy. Therefore, there is no genuine issue of material fact as to whether Point would have remained solvent if Sony had not breached the Agreement. Accordingly, Sony cannot be held liable for any damages that accrued after Point was unable to meet its obligations under the contract. However, for the reasons stated above, Point may pursue its claim for pre-bankruptcy damages, subject to the limitations discussed above.

### III. Plaintiff's Sales Expert's Testimony Precluded as Moot

As we have already granted defendant's motion to limit damages to pre-bankruptcy damages, we need not consider defendant's motion in limine to exclude the testimony of Graham Churchill because his testimony regarding projected music sales is moot as it would only have been offered to calculate plaintiff's post-bankruptcy damages.

### *CONCLUSION*

For the reasons stated above, we grant defendant's motion to exclude evidence of Point's post-bankruptcy damages. Defendant's motion to exclude the testimony of Graham Churchill is denied as moot.

**IT IS SO ORDERED.**